**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEPHANIE RENEE MINOR, *et al*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 13-1821 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| CUMBERLAND TOWNSHIP, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER

For the reasons stated below, Defendants' Motion for Summary Judgment (Doc. 57) will

be GRANTED in part and DENIED in part.

## I. MEMORANDUM

This civil rights law suit stems from events that occurred on October 19, 2012, when

Officers Russell Paul Miller, Jr. ("Officer Miller") and Garrett Toothman ("Officer Toothman"),

(collectively, the "Officer Defendants"), police officers of the Cumberland Township Police

Department, entered the home of Plaintiffs Stephanie Renee Minor ("Ms. Minor") and her three

minor children, L.M., B.J., and J.M ("the Minor children") or ("the Children").[1] See generally

Am. Compl. (Doc. 16). This entry led to Ms. Minor being handcuffed, arrested and charged with

various crimes, which ultimately were dismissed. See (Doc. 63-15).

Officers Miller and Toothman along with Cumberland Township (collectively,

"Defendants") filed their first Motion to Dismiss on March 10, 2014, which the Court granted in

---

[1] Plaintiff L.M. died on September 7, 2015. See (Doc. 45-1). On February 5, 2016 the Court
ordered that the Estate of James Logan Minor be substituted as party for Plaintiff L.M. (Doc.
48). Any reference to all Plaintiffs hereafter includes the Estate of James Logan Minor instead
of Plaintiff L.M. Likewise, any reference to "the Minor children" or "the Children" includes the
Estate of James Logan Minor instead of Plaintiff L.M.

part, dismissing various claims without prejudice to Plaintiffs filing an Amended Complaint. Plaintiffs filed an Amended Complaint bringing various claims against the Officer Defendants in their individual capacities, as well as Cumberland Township (the "Township"). (Doc. 21). Defendants then filed a renewed partial Motion to Dismiss, which the Court again granted in part, dismissing an additional claim. Defendants filed their answers shortly thereafter. (Doc. 22). The parties engaged in discovery and now, pending before the Court, is Defendants' Motion for Summary Judgment (Doc. 57).

## FACTS

Many of the facts surrounding the events of October 19, 2012 are disputed; however, the following facts are undisputed: After an argument with Lucas Cubic, an intern with the Cumberland Township Police Department, James Jurczak left the Nemacolin Citizen's Club, a private bar in Nemacolin, Pennsylvania, and drove to his residence at 113 Bliss Avenue, Nemacolin, Pennsylvania ("the Residence"). (Doc. 59) at ¶¶ 1, 6, 7, 8, 28; (Doc. 65) at ¶¶ 1, 6, 7, 8, 28. Officers Miller and Toothman of the Cumberland Township Police Department were in a patrol car watching a stop sign near the Residence when Mr. Jurczak arrived home. (Doc. 59) at ¶ 16; (Doc. 65) at ¶ 16.

Sometime thereafter, and after a series of disputed events that terminated with Mr. Jurczak entering the Residence, Officer Miller approached the side door of the Residence and banged on the door. (Doc. 59) at ¶ 35; (Doc. 65) at ¶ 35. Ms. Minor answered the door. Officer Miller informed her that he was looking for Mr. Jurczak – though the precise language he used to convey his point is in dispute – and in response Ms. Minor told Officer Miller that Mr. Jurczak was not inside. (Doc. 59) at ¶¶ 41, 43; (Doc. 65) at ¶¶ 41, 43. Officer Miller then said that "if Ms. Minor would not let him in the house, he would come in anyway." (Doc. 59) at ¶ 45;

(Doc. 65) at ¶ 45.  Ms. Minor replied by saying "Like hell you are."  (Doc. 59) at ¶ 46; (Doc. 65) at 46.  Ms. Minor attempted to close the door to prevent Officer Miller's entry into the home. (Doc. 59) at ¶ 48; (Doc. 65) at ¶ 48.  Whether and how much force she used in closing the door is in dispute.  (Id.)  Officer Miller entered the home and followed Ms. Minor into a first-floor bedroom.  (Doc. 59) at ¶¶ 51, 52; (Doc. 65) at ¶¶ 51, 52.  Officer Miller placed a handcuff on Ms. Minor's left wrist.  (Doc. 59) at ¶ 56; (Doc. 65) at ¶ 56.  "Ms. Minor placed her right arm between her legs," presumably to prevent him from handcuffing her other hand "and told Officer Miller that 'he wasn't taking [her] to jail.'"  (Doc. 59) at ¶ 57; (Doc. 65) at ¶ 57.  The precise series of events leading to Ms. Minor being fully handcuffed and placed under arrest are in dispute, however, that Officer Miller eventually arrested and transported her to Greene County Prison is not.  Compare (Doc. 59) at ¶¶ 59-72 with (Doc. 65) at ¶¶ 59-72.

When Officer Miller approached the side door of the Residence, Officer Toothman went to the rear of the Residence "to make sure that no one fled out the back."  (Doc. 59) at ¶ 34; (Doc. 65) at ¶ 34.  At some point thereafter, he entered the Residence.  (Doc. 59) at ¶ 77; (Doc. 65) at ¶ 77.  After entering the Residence, he went upstairs.  (Doc. 59) at ¶ 80; (Doc. 65) at 80. While in the upstairs of the house, Officer Toothman encountered Plaintiff B.J.  (Id.)  He also went to the basement.  (Doc. 59) at ¶ 81; (Doc. 65) at ¶ 81.  When he returned to the first floor of the house, Ms. Minor was already handcuffed.  (Doc. 59) at ¶ 83; (Doc. 65) at ¶ 83.  Officer Toothman "did not have any physical contact with Ms. Minor during the [arrest] struggle." (Doc. 59) at ¶ 85; (Doc. 65) at ¶ 85.

Once Ms. Minor was in custody, Officer Toothman contacted Green County Children and Youth Services ("CYS") regarding the Children.  (Doc. 59) at ¶ 87; (Doc. 65) at ¶ 87.  Jamie Imhoff, a caseworker for Greene County CYS came to the Residence.  (Doc. 59) at ¶ 88; (Doc.

65) at ¶ 88. Ms. Imhoff explained to Ms. Minor that CYS had to implement a safety plan because there were no adults in the home to take care of the Children. (Doc. 59) at ¶ 90; (Doc. 65) at ¶ 90. Plaintiffs L.M. and J.M. stayed with their aunt and subsequently with their father. (Doc. 59) at ¶¶ 93, 95, 96; (Doc. 65) at ¶¶ 93, 95, 96. Plaintiff B.J. stayed with her grandmother. (Doc. 59) at ¶ 94; (Doc. 65) at ¶ 94. The Minor children returned home to the Residence on December 13, 2012. (Doc. 59) at ¶ 100; (Doc. 65) at ¶ 100.

Officer Miller charged Ms. Minor with: aggravated assault (causing bodily injury to a police officer); endangering the welfare of children; resisting arrest; obstruction of the administration of law; and simple assault. (Doc. 59) at ¶ 101; (Doc. 65) at ¶ 101. Ms. Minor was committed to the Greene County Prison at 5:30 a.m. on October 19, 2012, and released on bail at or before 7:25 p.m. on the same day. (Doc. 59) at ¶ 105[2]; (Doc. 65) at ¶ 105; (Doc. 57-21). A Preliminary Hearing was held before Magistrate Judge Lee Watson on October 29, 2012, and Judge Watson determined there was probable cause to hold over all charges for trial. (Doc. 59) at ¶ 106, 112; (Doc. 65) at ¶¶ 106, 112. Ms. Minor filed a petition for habeas corpus alleging that "Officer Miller had no right to be in her house, [and that] any and all charges arising out of his presence there at that time should be dismissed." (Doc. 63-15) at 4. Pennsylvania Court of Common Pleas President Judge William Nalitz granted the petition and dismissed all charges against Ms. Minor. (Doc. 63-15) at 1. In doing so, President Judge Nalitz found that Officer Miller had:

> unlawfully and forcibly entered a private dwelling over the strong protests of the householder, pursued her into her children's bedroom, initiated physical contact with her, and followed her to the floor when she fell, rolled her over, placed her in handcuffs in front of her children and then took her to jail. At least he did not tase her. The charges

---

[2] Defendants' Concise Statement of Material Fact states that Plaintiff was released on October 19, 2015. Plaintiffs do not dispute this. The police record, however, indicates the correct date is October 29, 2012. See (Doc. 57-21).

against Defendant [Stephanie Renee Minor] arose only because of and in reaction to Officer Miller's illegal invasion of her house.
(Id.) at 6.

## STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. See Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 172 (3d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000).

## ANALYSIS

### Unlawful Entry

Defendants argue that there is no genuine issue of material fact as to Plaintiffs' Fourth Amendment claim for unlawful entry into Plaintiffs home and that both Officers Miller and Toothman were legally justified in entering the Residence. (Doc. 62) at 6, 11. The Court will address separately each Officer Defendant's alleged justifications for entry into the Residence.

Officer Miller contends he was in "hot pursuit" of Mr. Jurczak, a fleeing felon, when he entered the Residence, thus justifying his actions as a matter of law. "A warrantless home entry is presumptively unconstitutional, but 'exigent circumstances' can excuse the warrant requirement." Kubicki v. Whitemarsh Twp., 270 Fed.Appx. 127, 128 (3d Cir. 2008) (citing Welsh v. Wisconsin, 466 U.S. 740, 749–50, (1984)). "Exigent circumstances include, but are not

limited to, *hot pursuit of a suspected felon*, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." United States v. Coles, 437 F.3d 361, 366 (3d Cir. 2006) (emphasis added). Thus, whether Officer Miller was justified in the warrantless entry of the Residence turns on whether he believed he was in hot pursuit of a fleeing felon. If he believed Mr. Jurczak was fleeing a traffic stop for running a stop sign, he would not have been legally justified to follow him into the Residence. However, if he believed Mr. Jurczak was fleeing a DUI traffic stop, for example, he would have.

There exist substantial discrepancies regarding Officer Miller's version of events. The record evidence, read in the light most favorable to Plaintiffs, does not support Officer Miller's position that he had reason to believe Mr. Jurczak was intoxicated at the time of the alleged traffic stop and, therefore, fleeing a DUI stop. Specifically, there is a dispute as to whether Officer Miller had reason to believe Mr. Jurczak was driving while intoxicated. Compare (Doc. 59) at ¶ 23 (Officers Miller and Toothman both testified in depositions for this matter that they discussed the contents of Mr. Cubic's call with Officer Toothman after the call was completed) with (Doc. 63-8) at 13-14 (Officer Miller testified at Ms. Minor's Preliminary Hearing that he and Officer Toothman did not discuss the call between Officer Toothman and Mr. Cubic).

On the one hand, Officer Miller's police incident report states that "Patrolman G. Toothman received a telephone call from Lucas Cubic in regard to James Jurczak, James Jurczak had been drinking heavily and was causing problems to the point that the Nemacolin Citizens Club requested that he leave. Lucas Cubic informed Patrolman G. Toothman that he was intoxicated." (Doc. 57-9) at 6.

However, Officer Miller testified inconsistently at the Preliminary Hearing:

Q: So the hot pursuit that you were in was for a stop sign summary offense?
A: I had an individual fleeing a motor vehicle in a traffic stop.

Q: But the traffic stop was a summary offense?
A: It was a summary offense.
…
Q: You had no other evidence of any other crime; correct?
A: Not at that point.

(Doc. 63-8) at 21. As noted above, if Officer Miller did not have reason to believe that Mr. Jurczak was fleeing an attempted DUI stop, but rather fleeing a summary offense, he would not have been justified in pursuing him into the Residence.

Moreover, there is a dispute as to whether Mr. Jurczak was even "fleeing," as there are inconsistencies in the location of the Officer Defendants' vehicle relative to Mr. Jurczak when they attempted to effectuate the traffic stop, and inconsistencies as to whether and when the Officer Defendants activated lights and sirens. Compare (Doc. 59) at ¶¶ 25-27 with (Doc. 65) at ¶¶ 25-27.

In light of this background, the Court must find that there are genuine issues of material fact as to whether Officer Miller violated the Fourth Amendment rights of Ms. Minor and her Children when he forced himself into the Residence on October 19, 2012.

The analysis as to Officer Toothman's conduct differs slightly. Again, Defendants rely on the exigent circumstances exception in order to justify the warrantless entry into the home. Id. at 11 (citing Parkhurst v. Trapp, 77 F.3d 707, 712 (3d Cir. 1996) ("Concern for safety of others usually is a valid type of exigent circumstances.") Defendants argue that "Officer Toothman had an objectively reasonable belief that someone was in imminent danger." (Doc. 62) at 11. As supporting evidence, Defendants claim that "Officer Toothman had reliable information that Mr. Jurczak was intoxicated," that Officer Toothman had probable cause to believe that Mr. Jurczak "was attempting to flee from the police" and that "Officer Toothman heard a physical struggle coming from inside the house." (Id.) Plaintiffs dispute both Defendant

Toothman's credibility and that this explanation justifies Defendant Toothman's actions. (Doc. 59) at ¶¶ 75-77; (Doc. 65) at ¶¶ 75-77.

The Court agrees with Plaintiffs that this ultimately boils down to a question of Officer Toothman's credibility. Questions of a key witnesses's credibility must be left to a fact-finder to decide. Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor.") (internal quotations and citations omitted). Therefore, summary judgment as to whether Officer Toothman violated Plaintiffs' Fourth Amendment rights when he entered the Residence will be denied.

Accordingly, the Officer Defendants' Summary Judgment Motion will be denied as to Counts I, II and VI in so far as they allege unlawful entry in violation of the Fourth Amendment.

Excessive Force

As to Counts I and IV, Ms. Minor and J.M. claim that the Officer Defendants violated their Fourth Amendment right to be free from excessive force. As a preliminary matter, the Court agrees with Defendants that Ms. Minor's excessive force claims against Officer Toothman and those on behalf any Minor children are without evidentiary support. (Doc. 62) at 16. Ms. Minor herself testified that Officer Toothman "did nothing wrong." (Doc. 59) at ¶ 86. Moreover, there is no evidence in the record to support the position that any of the Children were physically injured, ((Doc. 59) at ¶¶ 62-63), nor does Plaintiffs' brief make any argument as to whether the Officer Defendants used any, let alone excessive, force against the Minor children. (Doc. 65) at 13-14.

Accordingly, Counts I and IV will be dismissed insofar as they relate to the use of excessive force by Officer Toothman and the use of excessive force against any Minor children.

The question remains whether sufficient evidence exists in the record from which a reasonable jury could conclude that Officer Miller utilized excessive force during the course of his interactions with Ms. Minor. Defendants do not dispute that Officer Miller utilized force, just whether the amount of force used was reasonable under the circumstances. After a thorough review of the record, the Court finds disputes of material fact as to Officer Miller's use of force against Ms. Minor. As the Court stated earlier, the precise series of events leading to Ms. Minor being fully handcuffed and placed under arrest are in dispute, including how Ms. Minor behaved during her interaction with Officer Miller and how much force Officer Miller employed. Compare (Doc. 59) at ¶¶ 59-72 with (Doc. 65) at ¶¶ 59-72. Accordingly, whether Officer Miller use of force against Ms. Minor was excessive under the circumstances is a question of fact and not appropriate for resolution at summary judgment. Summary Judgment will be granted on Counts I and IV as to excessive force against Officer Toothman and on behalf of the Minor children, but denied as to Officer Miller's interactions with Ms. Minor.

Cumberland Township's Liability

Count II alleges Cumberland Township is liable for the Officer Defendants' alleged misconduct through a theory of Monell liability. See Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978). Such a claim cannot be based on a theory of respondeat superior. Id. at 694.

> Local governing bodies … can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where … the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other

§ 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

Id. at 690–91.

Plaintiffs make three separate arguments as to why Cumberland Township should be liable for the alleged misconduct of its officers: (1) through formal acts and informal customs ((Doc. 65) at 9), (2) by a failure to train and/or supervise (id. at 10), and (3) through a failure to adopt adequate screening measures in hiring. (Id. at 12.) There simply is insufficient evidence in the record from which a reasonable jury could impugn Monell liability based on any of Plaintiffs' theories.

Plaintiffs point to the Township's "formal policy of limiting the use of force log to incidents involving a Taser" as a policy or custom that creates the municipal liability. (Doc. 65) at 9. This means that any use of force that does not involve a Taser would not be logged. However, during his deposition, Chief Miller indicated that electronic recordkeeping for all police reports obviated the need for separate use of force logs and that an incident involving officer force would be recorded in the official police report. (Doc. 63-13) at 5-7. Furthermore, Plaintiffs offer nothing of substance to explain why limiting use of force logs to Taser deployment would increase the likelihood that officers would engage in instances of excessive force.

Also, Plaintiffs fail to point to evidence establishing Monell liability premised on a failure to train theory. "[T]he inadequacy of police training may serve as a basis for Section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). Though, "as a general rule, an isolated incident, however unfortunate, does not

demonstrate evidence of [an agency's] persistent and widespread policy and will not be considered so pervasive as to be a custom or practice." <u>Thomas v. Bd. of Educ. of Brandywine Sch. Dist.</u>, 759 F. Supp. 2d 477, 492 (D. Del. 2010); <u>Berg v. Cnty. of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000) (holding that failing to adequately supervise, monitor, or train employees "can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations"). Furthermore, as the Court of Appeals for the Third Circuit has held, "[t]he mere failure of supervisory officials to act or investigate cannot be the basis of liability." <u>Stoneking v. Bradford Area School District</u>, 882 F.2d 720, 730 (3d Cir. 1989).

Here, there is no evidence that a failure to train resulted in these violations. Officer Defendants completed all Act 120 state-required training before joining the force and all Act 180 Mandatory Police Education and Training Commission annual training. (Doc. 57-5) at 7; (Doc. 57-8) at 5. Plaintiffs argue that, had the Officers participated in training in hot pursuit and the prohibition against entering a home without justification, the entire incident could have been avoided. (Doc. 65) at 12. However, "a mere showing that a particular officer violated policy, or that better training would have enabled the officer to avoid the injury-causing conduct, is insufficient to establish a municipality's liability under § 1983 for failure to train." <u>Marable v. W. Pottsgrove Twp.</u>, 176 F. App'x 275, 283 (3d Cir. 2006) (citing <u>Simmons v. City of Phila.</u>, 947 F.2d 1042, 1060 (3d Cir.1991)). "Only when a municipality's failure to train is tainted by a deliberate indifference to constitutional rights can that failure rise to the level of a municipal policy or custom – that is, a deliberate choice to follow a course of action made from among various alternatives by city policymakers." <u>Simmons</u>, 974 at 1060 (citing <u>City of Canton</u>, 489 U.S. at 389-90)) (internal citations omitted). Without more, the Court cannot find that a

reasonable trier of fact could conclude that the Township's failure to train gives rise to <u>Monell</u> liability.

Plaintiffs also imply that judicial opinions finding "significant constitutional violations" committed by members of the Cumberland Township Police Department – and Cumberland Township seemingly dragging its feet to implement needed corrections – establish a settled custom or policy that the Township "has failed to protect the constitutional rights of the citizens of Cumberland Township from the transgressions of the officers that the Township employs." (Doc. 65) at 10.  However, in order for a court to find a pattern or practice sufficient to establish a formal or informal custom, <u>Monell</u> requires a plaintiff articulate how the conduct is sufficiently similar to establish the pattern.  <u>See</u> <u>Connick v. Thompson</u>, 563 U.S. 61, 62 (2011) ("A pattern of *similar* constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.") (internal citations and quotations omitted) (emphasis added); <u>Berg v. County of Allegheny</u>, (examining whether the County defendant had sufficient procedures to guard against mistakenly issued warrants and concluded that a reasonable trier of fact could determine that such procedures were lacking); <u>c.f.</u> <u>Noone v. City of Ocean City</u>, 60 F.App'x 904, 910 (3d Cir. 2003) ("No reasonable safeguards have been identified that Municipal Defendants could have instituted to protect against the type of error that occurred here."); <u>Marable</u>, 176 Fed.Appx. at 283 ("Nor is there any evidence in the record of a pattern of mishandling of minors by the municipal defendants.")  Here, Plaintiffs provide no specifics about the judicial opinions with which Defendants allegedly failed to comply.  The Court has no basis from which to conclude that the facts in those cases were sufficiently similar to these in order establish repeated flagrant disregard under similar circumstances.

Finally, Plaintiffs claim that the Township failed in its hiring practices, because, among other things, Officer Miller and Toothman's job applications were "dangerously inadequate." (Doc. 65) at 12. Plaintiffs state:

> Had Cumberland Township taken a more thorough approach to the application process, they would have made certain to hire police officers with the appropriate basic knowledge necessary to accomplish their duties without trampling upon the rights of the citizens of Cumberland Township.

(Id.)

"[A] finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 412, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (emphasis in original). "The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong" and the subsequent constitutional violation must be "a plainly obvious consequence of the hiring decision." Id. "Courts that have addressed Brown have consistently interpreted it to mean that municipal liability for negligent hiring based on a single hiring decision requires the threat identified in an applicant's background to be basically identical to the harm eventually caused by the applicant." M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist., 43 F. Supp. 3d 412, 426-27 (M.D. Pa. 2014) (Kane, J.) (collecting cases).

Here, Plaintiffs have provided no evidence that it was plainly obvious to the Township that hiring the Officer Defendants would result in deprivation of Plaintiffs' constitutional rights. Without such evidence, the Court cannot find that a reasonable jury could conclude that the Township so failed in its hiring duties as to justify the imposition of Monell liability.

The Court acknowledges the high standard established by the Supreme Court to show Monell liability. Plaintiffs simply have not met that standard. If indeed Plaintiffs prove at trial that the Officer Defendants violated Plaintiffs' constitutional rights, the actions of the Officer Defendants cannot be properly attributed to the Township under a theory of Monell liability.

Due Process Violation

Count III alleges a claim for deprivation of due process relating to the removal of the Minor children following the events of October 19, 2012.[3] Substantive due process is violated when the action in question "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998). This allegation hinges on whether Officers Miller and Toothman acted objectively reasonably under the circumstances. Defendants argue that CYS, not Defendants, made the ultimate decision as to where the children should be placed and whether to remove them from their home and that Defendants called CYS because they had arrested Ms. Minor and no other adult remained in the Residence. (Doc. 62) at 14-15.

Plaintiffs argue that Defendants Miller and Toothman "started a chain of events which directly resulted in the unnecessary placement of Ms. Minor's children in the dependency system," (Doc. 65) at 13; however, that alone is not dispositive. There is no dispute that Defendants arrested Ms. Minor. There is no dispute that once Ms. Minor was taken into custody no adult remained at the residence capable of caring for the Minor children. Despite the

---

[3] Defendants move for summary judgment arguing that Plaintiffs' have failed to show how their conduct violated Plaintiffs' procedural due process rights. Plaintiffs' argue in their briefing that Defendants' conduct violated their substantive due process rights, though they cite to case law dealing with both substantive and procedural due process standards. The allegations in the Amended Complaint could be read to state violations of both substantive and procedural due process violations. Regardless, based on the Court's analysis, Plaintiffs would be unable to succeed on either theory of due process.

questions surrounding the legality of the entry into the Residence and the justification for Ms. Minor's arrest, once the Officer Defendants made the decision to arrest Ms. Minor, the phone call to CYS was objectively reasonable under the circumstances. Accordingly, the Court finds that no due process violation occurred when the Defendant Officers called CYS to take custody of the Minor children following the arrest of Ms. Minor. Defendants are correct that, for purposes of determining a constitutional violation, any subsequent decisions by CYS cannot be appropriately attributable to the Officer Defendants. The Court will grant summary judgment as to Count III.[4]

Federal False Arrest and Malicious Prosecution

Counts V and VII allege claims for false arrest and malicious prosecution pursuant to Section 1983. The Fourth Amendment prohibits a police officer from arresting a citizen except upon probable cause. Orsatti v. N.J. State Police, 71 F.3d 480, 482 (3d. Cir. 1995) (citing Papachristou v. City of Jacksonville, 405 U.S. 156, 169 (1972)). A court examining a Section 1983 claim for false arrest examines "not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to *believe* the person arrested had committed the offense." Dowling v. Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988) (emphasis added).

To prevail on a claim of malicious prosecution under §1983, a plaintiff must establish that: (1) defendant initiated a criminal proceeding; (2) the proceeding was initiated *without probable cause*; (3) the criminal proceeding ended in plaintiff's favor; (4) defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) plaintiff suffered

---

[4] While not a separate due process violation, the Court finds the circumstances involving CYS and Ms. Minor's separation from her children will indeed be relevant as to what damages Plaintiffs sustained should they succeed at trial on the remaining counts.

deprivation of liberty consistent with the concept of seizure as a consequence of a legal

proceeding. See Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009) (emphasis added).  Thus,

the absence of probable cause is an essential element in both a malicious prosecution and a false

arrest claim, and such claims cannot proceed if probable cause existed—regardless of whether

the arrest at issue was a wise or typical use of police resources.  See Dowling, 855 F.2d at 141.

Moreover, the Court concludes that sufficient evidence exists in the record from which a trier of

fact could conclude that the other essential elements have been met.

In order for the police to have properly arrested Ms. Minor, they must have had probable

cause on one of the following charges: aggravated assault, causing bodily injury to a police

officer; endangering the welfare of children, obstruction of the administration of law, or simple

assault.  "This is because the resisting arrest charge could not have provided probable cause for

the arrest *ab initio*."  Groman v. Township of Manalapan, 47 F.3d 628, 635 (3d Cir. 1995).

Thus, due to the uncertainty of the facts and the need for a finder of fact to make credibility

determinations as to which parties' version of events rings most true, the Court will deny

Defendants Motion for Summary Judgment as to Counts V and VII.

Qualified Immunity

The Officer Defendants assert qualified immunity as a defense as to all of Plaintiffs'

Section 1983 claims.  (Doc. 62) at 24.

> A court required to rule upon the qualified immunity issue must consider, then, this
> threshold question:  Taken in the light most favorable to the party asserting the injury, do
> the facts alleged show the officer's conduct violated a constitutional right?  This must be
> the initial inquiry.   If no constitutional right would have been violated were the
> allegations established, there is no necessity for further inquiries concerning qualified
> immunity.  On the other hand, if a violation could be made out on a favorable view of the
> parties' submissions, the next, sequential step is to ask whether the right was clearly
> established.

<u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). Because the Court concluded that there are questions of fact as to whether Plaintiffs' constitutional rights have been violated, the only issue to decide is whether the rights were clearly established at the time the alleged violations occurred. There can be no question here that the particular constitutional rights at issue, namely the Fourth Amendment rights to be free from unreasonable unlawful entry by an officer into a residence and to be free from an officer's use of excessive force, were clearly established at the time the Officers engaged in this conduct. Therefore, the Officer Defendants cannot take advantage of the protections of qualified immunity.

<u>Claims Under Pennsylvania Law</u>

In addition to their federal claims, Plaintiffs allege a number of violations of Pennsylvania law. Specifically, Ms. Minor alleges assault, battery, false arrest and false imprisonment, trespass, intentional infliction of emotional distress ("IIED"), invasion of privacy (entry into the home), malicious prosecution and civil conspiracy. Moreover, the Minor children join in the assault and invasion of privacy (entry into the home) claims and Plaintiff J.M. also alleges IIED.

A police officer may be held liable for assault and battery when the force used in making an arrest is unnecessary or excessive. <u>Renk v. City of Pittsburgh,</u> 537 Pa. 68, 76, 641 A.2d 289, 293 (1994); <u>Mills v. City of Harrisburg</u>, 350 Fed.Appx. 770, 774 (3d Cir.2009); <u>DeBellis v. Kulp</u>, 166 F.Supp.2d 255, 279 (E.D.Pa.2001). As the Court has found that genuine questions of fact and credibility exist as to Plaintiff Stephani Minor's excessive force claims, similar questions of fact and credibility exist as to her assault and battery claims. However, the same cannot be said for the claims on behalf of the Minor children. There is insufficient record evidence from which a reasonable jury could conclude that any of the Minor children suffered

from the intentional tort of assault by the Officer Defendants. <u>Renk</u>, 641 A.2d at 293 ("Assault is an intentional attempt by force to do an injury to the person of another…").

Much like their federal counterparts, claims for false arrest, false imprisonment, and malicious prosecution under Pennsylvania law each require a lack of probable cause. <u>Mills</u>, 350 Fed.Appx. at 774; <u>Murphy v. Bendig</u>, 232 Fed.Appx. 150, 153 (3d Cir.2007); <u>Sheedy v. City of Philadelphia</u>, 184 Fed.Appx. 282, 284 (3d Cir.2006). Given the Court's conclusion that genuine issues of material fact preclude a grant of summary judgment as to the federal false arrest and malicious prosecution claims, the same conclusion must hold for the corresponding Pennsylvania claims. Accordingly, the Court will deny summary judgment on Counts X and XIII.

Just as the Court's analysis of assault and battery depends on its prior analysis of excessive force, so too does its analysis of trespass turn on its prior analysis of the Officers unlawful entry into the Residence. And thus, because the Court has found that genuine questions of material fact exist as to Ms. Minor's unlawful entry claim, similar questions of fact and credibility exist as to Ms. Minor's trespass claim. Therefore, Defendants' Motion for Summary Judgment will be denied as to Counts VII, IV, X, and XI.

"Recovery for the tort of [IIED is] reserved by the courts for only the most clearly desperate and ultra extreme conduct." <u>Hoy v. Angelone</u>, 720 A.2d 745, 754 (Pa. 1998). In Pennsylvania, in order to establish a claim for IIED, a plaintiff must establish the following four elements: (1) extreme and outrageous conduct, (2) which is intentional or reckless; (3) it must cause emotional distress, and (4) that distress must be severe. <u>See Hoy v. Angelone</u>, 691 A.2d 476, 482 (Pa. Super. 1997). To establish a claim for IIED, "the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized society." Hoy, 720 A.2d at 754

(quoting Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. 1987)).

> Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have ... presented only the most egregious conduct. See [,] e.g., Papieves v. Lawrence, 263 A.2d 118 (Pa. 1970) (defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents […]); Banyas v. Lower Bucks Hospital, 437 A.2d 1236 (Pa. Super. 1981) (defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265 (3d Cir.1979) (defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false).

Id. at 754.

While the facts at issue here, if true, represent unacceptable conduct by public officials who hold positions of trust; the facts are simply not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society" as that standard has been used by courts applying Pennsylvania law. Id. Therefore, Defendants' Motion for Summary Judgment as to Count XII will be denied.

Count XIV alleges that the Officer Defendants committed the intentional tort of Invasion of Privacy (Entry Into the Home) when they entered the Residence on the night in question.

> Pennsylvania recognizes a cause of action for tortious 'intrusion upon seclusion.' […] The tort may occur by (1) physical intrusion into a place where the plaintiff has secluded him or herself […] Liability attaches only when the intrusion is substantial and would be highly offensive to 'the ordinary reasonable person.'

Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 620-21 (3d Cir. 1992) (citing Marks v. Bell

Telephone Co., 331 A.2d 424, 430 (Pa. 1975) and Harris by Harris v. Easton Publishing Co., 483

A.2d 1377, 1383-84 (Pa. Super. 1984)). Neither Defendants nor Plaintiffs have sufficiently

explained to the Court how these facts do or do not meet this standard. Defendants focus on how

this claim is barred by the Pennsylvania Municipal Tort Claims Act or that the Officers were privileged to enter the Residence. (Doc. 62) at 30. Plaintiffs dispute that. (Doc. 65) at 21. As such, neither party has pointed to any case law – and the Court can find none – where a court has held that, under Pennsylvania law, a violation of an individual's Fourth Amendment right constitutes the tort of Invasion of Privacy/ Intrusion Upon Seclusion. Moreover, the tort must be intentional and there is no record evidence that either Officer Defendant possessed the requisite intent to commit such a tort. Accordingly, Defendants' Motion for Summary Judgment will be granted as to Count XIV.

In Count XVI, Ms. Minor claims Officers Miller and Toothman conspired with one another to commit acts against her including violating her rights under the Constitutions and statues of the United States and the Commonwealth of Pennsylvania and Pennsylvania laws. "A cause of action for conspiracy requires that two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means." Burnside v. Abbot Laboratories, 505 A.2d 973, 980 (Pa. Super 1985). "Conspiracy may be proved by direct or by circumstantial evidence." Rosenblum v. Rosenblum, 181 A. 583, 583 (Pa. 1935). "While conspiracy may be proved by circumstantial evidence, the evidence must be full, clear and satisfactory." Fife v. Great Atl. & Pac. Tea Co., 52 A.2d, 24, 27 (Pa. 1947).

While Plaintiff has pointed to sufficient questions of material fact as to the underlying offenses which she claims form the basis of the civil conspiracy, she has not pointed to any record evidence – direct or circumstantial – from which a finder of fact could conclude that the Officer Defendants did, in fact, conspire to commit an act by unlawful means. Plaintiffs' narrative, that:

> the Officers engaged together in a pursuit of their target for whom they laid in wait for nearly an hour. When they were unable to catch him, the two officers engaged in a

> coordinated attack on the Plaintiff's home. While Officer Miller restrained Ms. Minor, Officer Toothman performed an illegal search of the home

((Doc. 65) at 23), lacks any support in the record. (Doc. 65) at 23. At this stage in the litigation, the Court requires more than mere allegations and speculation to find that a reasonable jury could conclude that the Officer Defendants conspired with one another to violate Pennsylvania law or violate Ms. Minor's constitutional rights. Accordingly, Defendants' Motion for Summary Judgment as to Plaintiffs' Civil Conspiracy claim, Count XVI, will be GRANTED.

## II. <u>ORDER</u>

Consistent with the foregoing, Defendants' Motion for Summary Judgment (**Doc. 57**) is **GRANTED IN PART and DENIED IN PART**. Specifically, the following Counts are DISMISSED with prejudice: Count II, Count III, Count XII, Count XIV and Count XVI. Count I and Count IV are DISMISSED insofar as they allege that Officer Miller engaged in excessive force against the Minor children and insofar as they allege that Officer Toothman engaged in excessive force. Defendants' Motion is DENIED in all other respects.

IT IS SO ORDERED.

June 27, 2017                                                    s/Cathy Bissoon
                                                                Cathy Bissoon
                                                                United States District Judge

cc (via ECF email notification):

All Counsel of Record